### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| Progressive Casualty Insurance Co., | |
| Plaintiff, | Civil No. 3:23-cv-01370 (SVN) |
| v. | |
| Sandra Vargas *et al.*, | September 11, 2024 |
| Defendants. | |

### REPORT AND RECOMMENDATION ON
### PLAINTIFF'S REQUEST TO ENTER DEFAULT JUDGMENT [ECF No. 24]

I.    **INTRODUCTION**

This is an automobile insurance case in which the plaintiff, Progressive Casualty Insurance Company ("Progressive"), seeks a declaration that it is not obliged to defend or indemnify its insureds from two lawsuits pending in the Connecticut Superior Court. (Compl., ECF No. 1.) The insureds failed to appear in this case, and Progressive moved for a default judgment. (Req. to Enter Default J., ECF No. 24.) The presiding District Judge, the Honorable Sarala V. Nagala, referred the motion to me, Magistrate Judge Thomas O. Farrish. (Order of Referral, ECF No. 26.) After observing some issues with the motion, I received two additional briefs and held oral argument. (Suppl. Submission in Supp. of Mot. for Default J., ECF No. 35; Second Suppl. Submission in Support of Default J., ECF No. 39; Tr. of Hrg. on Mot. for Default J., ECF No. 40.) The motion is now ripe for decision.

Having carefully considered Progressive's written submissions and arguments, I recommend that Judge Nagala **DENY** the motion for default judgment. As will be explained in Section III.A.2 below, the Court lacks jurisdiction over Progressive's claim for a declaratory

1

judgment respecting its duty to indemnify, because there is not yet a justiciable case or controversy over that duty.  And as will be explained in Section III.A.3, while the Court has jurisdiction over Progressive's claim for a declaratory judgment respecting its duty to defend, it should decline to exercise that jurisdiction in this instance.

If Judge Nagala were to accept these recommendations and deny Progressive's motion on jurisdictional grounds, the analysis would end there.  I have nevertheless analyzed the merits of Progressive's motion in Section III.B below, for Judge Nagala's consideration in the event that she disagrees with the jurisdictional recommendation.  To summarize that analysis, if the Court were to reach the merits of the duty-to-defend claim, I would still recommend that Progressive's motion be denied.  Even if its well-pleaded factual allegations are deemed admitted, Progressive has failed to show that it has no duty to defend in this case.  (*See* discussion, Section III.B *infra*.)

## II.    BACKGROUND

Progressive issued an automobile insurance policy to Sandra Vargas effective October 24, 2022.  (Compl., ECF No. 1, ¶ 13; *see also* Policy, ECF No. 30) (hereinafter "Policy").  Mrs. Vargas was the named insured, and her then-husband, Jose S. Vargas, was listed as a "[d]river[] and resident relative[]."  (Policy, ECF No. 30, at ECF page 4.)  At inception, the Policy provided liability coverage for the Vargases' use and operation of a 2019 Dodge Durango, with liability limits of $100,000 per person and $300,000 per accident.  (*Id.*)

On November 29, 2022, Mrs. Vargas called Progressive and asked it to drop the Durango from the Policy.  (Compl., ECF No. 1, ¶ 15.)  Progressive complied, and it issued a new declarations page reflecting the change.  (Policy, ECF No. 30, at ECF page 7.)  After the change, the Vargases had liability coverage only for their 2013 Hyundai Elantra, 2007 GMC Yukon, and 2015 Mercedes C400.  (*Id.*)

Mrs. Vargas had an accident in the Durango on December 8, 2022.  (Compl., ECF No. 1, ¶¶ 6, 9.)  She allegedly lost control of her car in a construction zone and struck a light post, causing it to fall upon and injure two construction workers, Marc Abrams and John Mackiewicz.  (Compl., *Abrams v. Vargas*, Count One ¶ 4, Ex. F to Resp. to Show Cause Order, ECF No. 28 (hereinafter "Abrams Complaint"); Compl., *Mackiewicz v. Vargas*, Count One ¶ 3, Ex. G to Resp. to Show Cause Order, ECF No. 28 (hereinafter "Mackiewicz Complaint").)  The two workers allege that she was under the influence of alcohol at the time.    (Abrams Complaint, Count Two ¶ 5; Mackiewicz Complaint, Count Two ¶ 5.)

On December 23, 2022, Mrs. Vargas called Progressive and asked it to reinstate the Durango as a covered vehicle on the Policy.  (Compl., ECF No. 1, ¶ 17.)  Furthermore, she requested that the reinstatement be retroactive to November 29, 2022.  (Memo. of L. in Supp. of Pl.'s Req. to Enter Default J., ECF No. 25, at 7.)  When she called to request the reinstatement, she did not tell Progressive about the December 8, 2022 accident.  (Compl., ECF No. 1, ¶ 18.)

Mr. Mackiewicz sued Mrs. Vargas in New Britain Superior Court in January of 2023, and Mr. Abrams sued her in New Haven Superior Court in March of 2023.  (Mackiewicz Complaint at 1, Abrams Complaint at 1.)  Both plaintiffs also sued Mr. Vargas, alleging that he owned the vehicle that Mrs. Vargas was driving and was therefore vicariously liable under the family car doctrine.  (Abrams Complaint, Count Three ¶¶ 9-10; Mackiewicz Complaint, Count Four ¶¶ 12-13.)  In addition, both plaintiffs sued Sandra V Auto Broker CT LLP (hereinafter "Auto Broker"), a business in which Mr. and Mrs. Vargas were the partners.  (Abrams Complaint, Count Four; Mackiewicz Complaint, Count Five; *see also* Certificate of Ltd. Liab. P'Ship, Ex. E to Resp. to Show Cause Order, ECF No. 28.)  The plaintiffs alleged in the alternative that Auto Broker owned the vehicle, and that it was therefore vicariously liable for Mrs. Vargas's conduct.

Progressive learned about the December 8, 2022 accident when a third party – it does not say who – alerted it to the filing of the Abrams lawsuit in 2023. (Suppl. Submission in Supp. of Mot. for Default J., ECF No. 35, at 2.) Upon learning of the accident, it "contacted" Mrs. Vargas on June 14, 2023 to "discuss the Abrams matter" with her. (*Id.*) Four months later, the company filed this federal court declaratory judgment suit. It sought a declaration that it is not obliged to defend or indemnify Mrs. Vargas, Mr. Vargas, or Auto Broker from the Abrams and Mackiewicz lawsuits, because Mrs. Vargas "misrepresented through omission the fact that there was a known loss when she sought reinstatement of the 2019 Dodge Durango as a covered vehicle on the Policy." (Compl., ECF No. 1, ¶¶ 19-20.)

For the most part, Progressive has not said what happened between the June 14, 2023 call with Mrs. Vargas and the filing of this action on October 19, 2023. Evidently the company decided to defend the Vargases under a reservation of rights. (Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 5:18-21.) But it has not said whether the Vargases requested that defense, or whether instead the company merely defended on its own initiative to better control the litigation. Progressive has also not said whether the Vargases asked for indemnification and, if so, whether that claim was formally denied. This will have implications for the Court's jurisdiction over the case, as will be discussed below.

Progressive served its declaratory judgment complaint on the Vargases and Auto Broker on November 21, 2023. (Return of Service, ECF No. 9.) All three defendants failed to appear within the time required by Rule 12, and Progressive therefore moved for the entry of defaults under Rule 55(a). (Mots. for Default Entry, ECF Nos. 11, 12, 13.) The Court granted the motions, and the Clerk entered each defendant's default on December 26, 2023. (Orders, ECF Nos. 14, 15, 16.) Progressive did not quickly follow with a default judgment motion, and when it did, its motion

was filed under the wrong rule and lacked a supporting memorandum of law.  (*See* Order Denying Mots. for Default J., ECF No. 23.)  But Progressive corrected those defects in the revised default judgment motion that is currently before the Court.  (Req. to Enter Default J., ECF No. 24.)  Judge Nagala then referred that motion to me.  (Order of Referral, ECF No. 26.)

Upon conducting its initial review of the motion, the Court questioned whether it had jurisdiction over the case.  (Order to Show Cause, ECF No. 27.)  Progressive had claimed diversity jurisdiction (Compl., ECF No. 1, ¶ 5), but the complaint lacked sufficient information about the parties' citizenship and about the amount-in-controversy requirement.  (Order to Show Cause, ECF No. 27.)  The Court directed Progressive to show cause why the case should not be dismissed for lack of subject matter jurisdiction, and Progressive responded by providing some information about the citizenship of the parties.  (Resp. to Show Cause Order, ECF No. 28.)  With respect to the amount in controversy, Progressive supplied the Court with copies of the underlying Superior Court complaints, both of which contained statements of the plaintiffs' injuries.  (*Id.*)

Digging into the motion more deeply, the Court next observed reasons to question whether this is the sort of declaratory judgment action as to which it should decline to exercise jurisdiction.  (Order re: Mot. for Default J., ECF No. 31.)  It also observed reasons to question whether, if it were to reach the merits, it should give Progressive the declaration it sought.  (*Id.*)  The motion for default judgment relied on the "Fraud and Misrepresentation" article in the Policy, and that article seemed to say that Progressive's remedy for the alleged "misrepresentation by omission" would not be a complete denial of defense and indemnity coverage, but rather a reduction in liability coverage limits from $100,000 to the Connecticut statutory minimum of $25,000.  (*Id.*)  Thus, when the Court scheduled oral argument, it directed Progressive's counsel to be prepared to discuss these issues.  (*Id.*)

The Court then held a hearing on the motion. (Tr. of Hrg. on Mot. for Default J., ECF No. 40.) At the conclusion of the argument, Progressive's counsel stated that if the Court was "inclined to think that we haven't sufficiently met a proffer showing that the Court should exercise its jurisdiction, [he] would appreciate the opportunity to amend the record to address that concern." (*Id.* at 22:6-10.) The Court granted that request, and counsel made a supplemental submission a week later, and a second supplemental submission after that. (Suppl. Submission in Supp. of Mot. for Default J., ECF No. 35; Second Suppl. Submission in Supp. of Mot. for Default J., ECF No. 39.) In summary, after having been alerted by the Court to the myriad jurisdictional and merits issues raised by its motion, Progressive has been permitted to make three written submissions in support (Memo. of L. in Supp. of Pl.'s Req. to Enter Default J., ECF No. 25; Suppl. Submission in Supp. of Mot. for Default J., ECF No. 35; Second Suppl. Submission in Supp. of Mot. for Default J., ECF No. 39); has had a full oral argument (Tr. of Hrg. on Mot. for Default J., ECF No. 40); and has had one other conference with the Court. (*See* Conf. Memo. and Order, ECF No. 38.) The motion is therefore ripe for resolution.

## III. DISCUSSION

### A. Subject Matter Jurisdiction

Before it can consider the merits of Progressive's motion, the Court must address its jurisdiction over the case. As the Second Circuit has explained, even when the defendant does not contest the issue, courts "have an independent obligation to determine whether federal jurisdiction exists[.]" *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt.*, 692 F.3d 42, 48 (2d Cir. 2012). "This rule flows from the principle that a failure of subject matter jurisdiction is not waivable . . . and from the principle that a party seeking to invoke the subject matter jurisdiction of a Court has the burden of demonstrating that there is subject matter jurisdiction in the case."

6

*Mumma v. Pathway Vet Alliance, LLC*, 648 F. Supp. 3d 373, 386 (D. Conn. 2023) (brackets, quotation marks, and citations omitted).

Two statutes invest federal courts with jurisdiction. "28 U.S.C. § 1331 . . . addresses federal question jurisdiction, and 28 U.S.C. § 1332 . . . addresses diversity jurisdiction." *Ohio Sec. Ins. Co. v. Veteran Constr. Servs.*, No. 3:23-cv-257 (SVN), 2024 WL 1287583, at *4 (D. Conn. Mar. 26, 2024). Progressive does not contend that this case implicates the Court's federal question jurisdiction, even though it has sued under the federal Declaratory Judgment Act ("DJA") (*see* Compl., ECF No. 1, ¶¶ 5, 23), presumably in recognition of the rule that the DJA "alone does not provide a court with jurisdiction." *California v. Texas*, 593 U.S. 659, 672 (2021); *see also Smulley v. Safeco Ins. Co. of Ill.*, No. 3:20-cv-1888 (JAM), 2021 WL 3374741, at *5 (D. Conn. Aug. 3, 2021) ("[B]ecause the [DJA] expressly conditions its application on there being an actual controversy within a federal court's jurisdiction, it is well established that a complaint's invocation of the [DJA] is not enough by itself to sustain federal question jurisdiction."), *aff'd*, No. 21-2124-cv, 2022 WL 16753118 (2d Cir. Nov. 8, 2022). Instead, Progressive seeks to invoke the Court's diversity jurisdiction. (Compl., ECF No. 1, ¶ 5.)

### 1.   *Diversity jurisdiction*

Under 28 U.S.C. § 1332, diversity jurisdiction does not exist unless two principal requirements have been met. The first is that the "matter in controversy" must exceed "the sum or value of $75,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(a). In the context of this case, the second is that the dispute must be "between . . . citizens of different States[.]" *Id.* The party seeking to invoke diversity jurisdiction bears the burden to show that both requirements have been satisfied. *See Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998) ("The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of

demonstrating that the grounds for diversity exist and that diversity is complete."); *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) ("A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." (citation and quotation marks omitted)).

In declaratory judgment actions, the amount-in-controversy requirement is met if "the value of the object of the litigation" exceeds $75,000. *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *4 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). When the action seeks a declaration about an insurance policy, courts employ two different methods for measuring that value, depending on the type of declaration sought. If the plaintiff seeks a declaration about "the applicability of an insurance policy to a particular occurrence, the jurisdictional amount in controversy is measured by the value of the underlying claim – not the face amount of the policy." *Amica Mut. Ins. Co. v. Levine*, 7 F. Supp. 3d 182, 187 (D. Conn. 2014) (quoting *Hartford Ins. Group v. Lou–Con, Inc*., 293 F.3d 908, 911 (5th Cir.2002)) (collecting cases). But if the "substance of the declaratory judgment action seeks to determine the validity of an insurance policy, then the policy limit is the amount in controversy." *Id.* (quoting *Infinity Ins. Co. v. Guerrero*, No. CIV F 07-583 (AWI) (TAG), 2007 WL 2288324, at *3 (E.D. Cal. Aug. 8, 2007)); *see also Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 805 (7th Cir. 2003) ("[W]hen the validity of a policy (as opposed to the insurer's obligation to pay) is in dispute, the face value of that policy is the proper measure of the amount-in-controversy.").

In this case, the amount-in-controversy requirement is satisfied. Progressive does not seek to rescind its Policy; rather, it merely seeks a declaration that the Policy does not provide coverage for Mrs. Vargas's December 8, 2022 accident. (Compl., ECF No. 1, at 4.) The amount in controversy is therefore "measured by the value of the underlying claim[,]" *Amica Mut. Ins. Co.*,

7 F. Supp. 3d at 187, and there are two such claims at issue here – Mr. Abrams' and Mr. Mackiewicz's.  (Compl., ECF No. 1, ¶¶ 7-8.)  With respect to Mr. Abrams, Progressive states that he "alleges severe injuries of a fractured rib, lacerated spleen, [and] left upper abdominal pain." (Resp. to Show Cause Order, ECF No. 28, at 6-7; *see also* Abrams Complaint at 2-3.)  And with respect to Mr. Mackiewicz, Progressive states that he "alleges severe injuries of headaches, left eye injury, blurred vision, cervical strain/sprain, neck pain, [and] bi-lateral hip injury."  (Resp. to Show Cause Order, ECF No. 28, at 7; *see also* Mackiewicz Complaint at 7-8.)  Both plaintiffs have asserted recklessness claims, raising the possibility of double or treble damages under Conn. Gen. Stat. § 14-295.  (Resp. to Show Cause Order, ECF No. 28, at 7.)  Superior Court juries have returned verdicts exceeding $75,000.00 in cases that were roughly analogous to Mr. Abrams', even without doubling or trebling, and even without considering Mr. Mackiewicz's claim.  *See, e.g.*, *Perez v. Diaz*, No. FBT-CV-15-6050128-S, 2017 WL 4467206 (Conn. Super. Ct. Apr. 19, 2017) (awarding $85,355.00 to a plaintiff with fractured ribs and a torn labrum in his hip, but without a lacerated spleen).  At this stage, Progressive must show only a "reasonable probability that the claim is in excess of the statutory jurisdictional amount," *Tongkook Am.*, 14 F.3d at 784 (quotation marks and citation omitted), and it has done so.

The diversity-of-citizenship requirement is satisfied when the plaintiff and the defendant are "citizens of different States[.]"  28 U.S.C. § 1332(a)(1).  For purposes of this requirement, a corporation is "deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The corporation's "principal place of business" is "the place where the corporation's high level officers direct, control, and coordinate [its] activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010).  In the case of an unincorporated business entity, such as a limited liability company or a partnership, the entity is a

citizen of each state in which a member or a partner is a citizen. *Bayerische Landesbank*, 692 F.3d at 49 ("[A] limited liability company . . . takes the citizenship of each of its members."); *Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 615 (2d Cir. 2019) ("For the purposes of diversity jurisdiction, a partnership takes the citizenship of all of its partners."). A natural person "is deemed a citizen of the state wherein he or she is domiciled." *Universal Reins. Co. v. St. Paul Fire & Mar. Ins. Co.*, 224 F.3d 139, 141 (2d Cir. 2000) (citing *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998)).

A person's state of domicile is not necessarily his state of residence. "Domicile has been described as the place where a person has 'his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Linardos*, 157 F.3d at 948 (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3612, at 526 (2d ed. 1984)). Conversely, "a person may have a residence in a place in which he or she intends to live only temporarily." *Gross v. Rell*, 485 F. Supp. 2d 72, 77 (D. Conn. 2007). Of course, a person's domicile and his residence "typically coincide." *Windward Bora LLC v. Browne*, 110 F.4th 120, 124 n.5 (2d Cir. 2024) (quoting 13E C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3612, at 527 (3d ed. 2009)). Nevertheless, "[d]omicile and residence are not synonymous," *id.*, and "a party can reside in one place and be domiciled in another." *Kennedy v. Trs. of Testamentary Tr. of Will of Kennedy*, 633 F. Supp. 2d 77, 81 (S.D.N.Y. 2009) (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47-49 (1989)), *aff'd,* 406 F. App'x 507 (2d Cir. 2010).

When a complaint contains allegations of residence and not domicile, courts in the Second Circuit typically have not ignored the omission, even though the two concepts often overlap. In *Century Metal Recycling, Pvt. Ltd. v. Dacon Logistics, LLC*, for example, the plaintiff alleged "upon

information and belief" that a natural person defendant lived in New Jersey, and "conclusively state[d]" that the defendant was therefore a citizen of New Jersey.  No. 3:13-cv-93 (CSH), 2013 WL 5929816, at *2 (D. Conn. Nov. 4, 2013).  In considering whether he had jurisdiction to rule upon a subsequent motion for default judgment, Judge Haight analyzed the "differences between a domicile and a residence" and observed that "[t]he test for an individual's residency is . . . significantly less stringent than the 'more rigorous domicile test.'"  *Id.* at *3 (quoting *Martinez v. Bynum*, 461 U.S. 321, 331 (1983)).  He noted that "'a statement of residence, unlike domicile, tells the court only where the parties are *living* and not of which state they are *citizens.*'"  *Id.* at *2 (quoting *John Birch Soc'y v. Nat'l Broad. Co.*, 377 F.2d 194, 199 (2d Cir. 1967)).  "[A] court may not and cannot simply infer the latter from the former."  *Id.* at *3 (citing *Realty Holding Co. v. Donaldson*, 268 U.S. 398, 399 (1925)).  "Thus it is 'well-established that allegations of residency alone cannot establish citizenship.'"  *Id.* at *2 (quoting *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 102-03 (2d Cir. 1997)).  Because the plaintiff had alleged only residency, not domicile, it had not alleged facts sufficient to establish diversity jurisdiction.  *Id.* at *3; *see also MBC Ventures, LLC v. Miniventures of NY, Inc.*, No. 3:20-cv-762 (CSH), 2021 WL 3709808, at *6-7 (D. Conn. Aug. 20, 2021) ("Because Plaintiff has simply alleged that Defendant . . . resides in Norwalk, Connecticut, it has failed to establish her citizenship."); *S Rock Partners, LLC v. Kiselev*, No. 3:17-cv-1670 (CSH), 2018 WL 888725, at *5 (D. Conn. Feb. 14, 2018) ("Plaintiff has failed to establish the citizenship of [Defendant].  Plaintiff merely states his residence, as opposed to domicile, before November of 2015 – approximately two years before Plaintiff commenced this action . . . ."); *Zeevi v. Konfino*, No. 3:12-cv-1125 (CSH), 2012 WL 6026219, at *3 (D. Conn. Dec. 4, 2012) ("While Plaintiff has in her Complaint alleged *residency* of herself and Defendant, she has not established either party's *citizenship.*").

In this case, Progressive's complaint does not allege facts sufficient to satisfy the diversity-of-citizenship requirement.  With respect to its own citizenship, it says that it is "an insurance company located in Mayfield Village, Ohio," but it does not say where it is incorporated or where it has its "principal place of business" under the *Friend* test.  (Compl., ECF No. 1, ¶ 1.)  With respect to Mr. and Mrs. Vargas, it says only that they are "individual[s] *residing* in Meriden, Connecticut." (*Id.* ¶¶ 2-3) (emphasis added).  And in the case of Auto Broker, the complaint alleges only that it "is a domestic limited partnership with a principal business address in Meriden[.]"  (*Id.* ¶ 4.)  These allegations do not suffice – because the allegations about Mr. and Mrs. Vargas are allegations of residence only, not domicile; and because the citizenship of a limited partnership or limited liability company is determined by the citizenship of its partners or members, not by its "principal business address."

The Court alerted Progressive to the diversity-of-citizenship issue (Order to Show Cause, ECF No. 27), and the company's response demonstrates that these defects could likely be cured with a pleading amendment.  (Resp. to Show Cause Order, ECF No. 28.)  Progressive provided the Court with a copy of its Ohio articles of incorporation (Ex. A to Resp. to Show Cause Order), and elsewhere it has confirmed that its principal place of business is in Ohio.  (Corp. Disclosure Stmt., ECF No. 8.)  It evidently contends that it could, consistent with Rule 11, upgrade its allegations against Mr. and Mrs. Vargas from allegations of residency to allegations of domicile.  (Resp. to Show Cause Order, ECF No. 28, at 3-4) (asserting that each of the natural person defendants "is domiciled in Connecticut").  And it obtained a copy of Auto Broker's certificate of limited liability partnership from the Connecticut Secretary of the State, which shows that Mr. and Mrs. Vargas were the only partners.  (Ex. E to Resp. to Show Cause Order, ECF No. 28.)

When a complaint fails to show that the diversity-of-citizenship requirement has been met, courts do not ordinarily deny default judgment motions for that reason alone. Instead, they typically give the plaintiff leave to cure the defect, either through a pleading amendment or through affidavits confirming the citizenship of all parties. *E.g., IndyMac Venture, LLC v. Mulligan*, No. CV 15-7057 (ADS) (GRB), 2019 WL 4648419, at *5 (E.D.N.Y. Aug. 30, 2019) ("Because the failure to properly allege the predicate facts to establish subject matter jurisdiction may be cured, if appropriate, by an amendment[,]" the Magistrate Judge "recommend[ed] that plaintiff be given leave to amend . . . to cure the jurisdictional deficiencies."), *report and recommendation adopted*, 2019 WL 4647222 (E.D.N.Y. Sept. 24, 2019); *Century Metal Recycling*, 2013 WL 5929816, at *4 (refraining from denying the plaintiff's motion for default judgment, but ordering the plaintiff "to establish, by affidavit, both its own citizenship and the citizenship of both Defendants"). If the other defects in Progressive's default judgment motion were curable, I would recommend that Judge Nagala allow it an opportunity to amend its pleadings, even though such an amendment would arguably be untimely. (*See* Order on Pretrial Deadlines, ECF No. 3) (setting deadline of December 18, 2023 for pleading amendments). As will be shown below, however, those other defects are not curable.

### 2.    *Additional jurisdictional principles applicable to declaratory judgments*

In addition to satisfying one of the statutory grants of jurisdiction, a federal lawsuit must also satisfy the "case or controversy" requirement of Article III of the Constitution. *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *5. "In order to qualify as a justiciable 'case or controversy' under Article III, '[t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013) (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). This rule follows from the principle that federal courts are not empowered to "decide abstract questions," *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 586 (1972), and from

the principle that they may not "give opinion[s] advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration in original) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)) (internal quotation marks omitted).

Progressive brings this case under the DJA, which provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Although the DJA allows parties to seek declaratory relief before a case has "reached the stage at which either party may seek a coercive remedy," actions brought under the DJA must still satisfy the "case or controversy" requirement. *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (quoting *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir. 1986)) (internal quotation marks omitted). Thus, while the Act permits parties to seek declaratory relief before their dispute ripens into a damages or contract breach claim, it does not empower federal courts to issue declarations about disputes that are not yet actual controversies. *See Nike, Inc.*, 663 F.3d at 95 ("The Declaratory Judgment Act does not expand the subject matter jurisdiction of the federal courts."). In distinguishing justiciable, actual controversies from non-justiciable, abstract questions, "the critical question is whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Admiral Ins. Co.*, 57 F.4th at 92 (citation, quotation marks, and ellipses omitted). Stated differently, an "'actual controversy' within the meaning of the [Act]" is "'a real and substantial controversy admitting of specific relief through a decree of a conclusive character.'" *Id.* (quoting *Aetna Life Ins. Co.*, 300 U.S. at 239, 241).

Because insurance protects against future events, "[j]usticiability concerns often arise in insurance declaratory judgments." *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *5. "Indeed,

litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real." *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (citation and quotation marks omitted).  In these cases, the fact "[t]hat liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action."  *Id.*  The key question is whether there is "a practical likelihood that the contingencies will occur."  *Id.*

In the liability insurance context, courts analyze "practical likelihood" separately for the duty to defend and the duty to indemnify.  The two duties are "distinct," and "insurance law applies 'very different presumptions to each.'"  *Admiral Ins. Co.*, 57 F.4th at 93 (quoting *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77 (2d Cir. 2013)).  "Because 'the duty to defend is triggered by the filing of a lawsuit while the duty to indemnify is triggered by a determination of liability,' a district court's jurisdiction to declare an insurer's duty to defend and its duty to indemnify turn on different inquiries."  *Id.* (quoting *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y. 2013)).  "With respect to the duty to defend, the district court must find a practical likelihood that a third party will *commence* litigation against the insured. With respect to the duty to indemnify, the court must find a practical likelihood that the third party will *prevail* in such litigation."  *Id.* (citing *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261).  "[A] district court may well have jurisdiction to issue a declaratory judgment on an insurer's duty to defend, even while holding that the duty to indemnify is not ripe for adjudication."  *Id.* (quotation marks, brackets, and citation omitted).

In this case, Progressive's duty-to-defend claim is justiciable under Article III.  "As the Second Circuit has made clear, 'the duty to defend is triggered by the filing of a lawsuit[.]'"  *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *6 (quoting *Admiral Ins. Co.*, 57 F.4th at 93).  "Thus, the

pendency of an action filed by a third party against the insured is a 'sufficient' condition for 'finding jurisdiction to declare an insurer's duty to defend an insured.'" *Id.* (quoting *Admiral Ins. Co.*, 57 F.4th at 95). Here, there are not one but two third-party suits pending against Progressive's insureds, Sandra and Jose Vargas. (*See* Abrams Complaint, Mackiewicz Complaint.) "Given the pendency of these actions, there is an actual controversy for purposes of the Declaratory Judgment Act concerning" the duty to defend. *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *6. This is particularly true where, as here, the insurer is paying for the insured's defense. *W. World Ins. Co. v. Sorosiak*, No. 3:12-cv-420 (MPS), 2013 WL 12303240, at *1 (D. Conn. Jan. 24, 2013) ("It is also plain that [the insurer's] duty to defend claim presents a live controversy ripe for adjudication, as defense costs are already presumably being incurred[.]").

The justiciability analysis is more complex with respect to the duty to indemnify. That duty is "'triggered by a determination of liability'" rather than by the allegations of the tort victim's complaint, and accordingly the ripeness of a declaratory judgment turns on "the practical likelihood that the third party will prevail against the insured in the underlying suit." *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *7 (quoting *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261, and citing *Admiral Ins. Co.*, 57 F.4th at 93). The analysis can therefore "require[] consideration of the factual disputes that are also at issue in the underlying action," and "[c]ourts are concerned about becoming entrenched in a factual quagmire that has yet to be resolved in" that action. *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261. Reflecting this concern, district courts frequently hold that claims for declaratory judgments on the duty to indemnify are non-justiciable when they implicate factual inquiries that overlap with an unresolved, underlying tort suit. *E.g., Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *7-8; *Penn-Star Ins. Co. v. Loring Place Realty LLC*, No. 22-cv-1154 (JPO), 2024

WL 1255423, at *7 (S.D.N.Y. Mar. 25, 2024); *Johnson v. Ironshore Spec. Ins. Co.*, No. 1:21-cv-3262 (GHW), 2022 WL 912973, at *8-9 (S.D.N.Y. Mar. 28, 2022).

Nevertheless, "[t]here is no *per se* rule . . . that all declaratory judgment actions brought to establish a duty to indemnify are premature during the pendency of an underlying action." *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *7 (citations omitted). "To the contrary, declaratory judgment actions regarding the duty to indemnify may be ripe even if liability has not been finally established in the underlying action." *Travelers Prop. & Cas. Co. of Am. v. Harleysville Worcester Ins. Co.*, 685 F. Supp. 3d 187, 214 (S.D.N.Y. 2023). In particular, some courts have held that declaratory judgment actions about an insurer's duty to indemnify a pending lawsuit are presently justiciable when the insurer pleads and proves that it has no duty to defend. In *State Farm Fire & Casualty Co. v. Mesniaeff*, for example, Judge Bryant carefully analyzed the underlying plaintiff's complaint allegations and concluded that the insurer did not have a defense obligation. No. 3:12-cv-1675 (VLB), 2014 WL 1154402, at *10 (D. Conn. Mar. 21, 2014). The policyholder then challenged the insurer's duty-to-indemnify claim on ripeness grounds, but Judge Bryant held that the claim was justiciable even though the underlying suit had not yet resolved. *Id.* at *11. Under Connecticut law, "where there is no duty to defend, there is no duty to indemnify." *Id.* at *10 (quoting *DaCruz v. State Farm Fire & Cas. Co.*, 268 Conn. 675, 688 (2004)). Because the insurer proved that it had no duty to defend, the indemnification question did not have to await the resolution of any factual issues in the underlying state court tort suit. *Id.* at *11; *accord Allstate Ins. Co. v. Tenn*, No. 3:19-cv-432 (JBA), 2020 WL 3489387, at *5 (D. Conn. June 26, 2020) (denying policyholder's motion to dismiss insurer's declaratory judgment claim respecting the duty to indemnify on ripeness grounds because the insurer had plausibly alleged a duty-to-defend claim that, if proven, would dispose of the indemnification question by necessary implication); *cf.*

*also Allstate Ins. Co. v. Tandon*, No. 3:13-cv-585 (HBF), 2015 WL 1395925, at *13 (D. Conn. Mar. 25, 2015) (holding, *sub silentio*, that a declaratory judgment claim concerning Allstate's duty to defend was justiciable; "because Allstate has no duty to defend in the underlying action, it thus follows that Allstate has no duty to indemnify").

In this case, however, the indemnification question cannot be resolved merely by invoking the rule of *DaCruz*. Considering the issues surrounding Progressive's defense duties (*see* discussion, Section III.B *infra*), the practical likelihood of its being called upon to indemnify is not controlled by the rule that "where there is no duty to defend, there is no duty to indemnify." Instead, it will depend on facts that have yet to be proven in the underlying case, including whether Mrs. Vargas was negligent in the operation of her car; whether Mr. Vargas or Auto Broker are subject to vicarious liability as the owner of the car; and so forth. When "the single decisive issue of negligence will be determined by the state court in the underlying action," "[a]ny decision on [the insurer's] duty to indemnify" must "await that determination." *Travelers Prop. Cas. Corp. v. Winterthur Int'l*, No. 02-cv-2406 (SAS), 2002 WL 1391920, at *7 (S.D.N.Y. June 25, 2002).

The Court lacks jurisdiction over Progressive's request for a declaratory judgment concerning its duty to indemnify because it cannot find that there is a practical likelihood of a judgment against the Vargases or their LLP on the current record. Progressive has provided no information about the facts of the underlying accident, and no reason to suppose that Mrs. Vargas will be held liable – except to say that Messrs. Abrams and Mackiewicz think she should be. (*See* Resp. to Show Cause Order, ECF No. 28) (attaching underlying plaintiffs' complaints, but otherwise saying nothing about liability). Mrs. Vargas did not admit liability in her answers to the complaints. (Answer, Dkt. No. 136.00, *Abrams v. Vargas*, No. NNH-CV23-6131035-S, Count One ¶ 5; Answer, Dkt. No. 126.00, *Mackiewicz v. Vargas*, No. NNH-CV23-6144404-S, Count

One ¶ 4; both *available at* www.civilinquiry.jud.ct.gov.)  For his part, Mr. Vargas denied owning

the car – and, by extension, he denied vicarious liability.  (Answer, Dkt. No. 109.00, *Abrams v.*

*Vargas*, No. NNH-CV23-6131035-S; Answer, Dkt. No. 126.00, *Mackiewicz v. Vargas*, No. NNH-

CV23-6144404-S, Count Four ¶ 10; both *available at* www.civilinquiry.jud.ct.gov.)  Where an

insurer's declaratory judgment complaint "does not provide any allegations concerning the

likelihood that [the insured] will be held liable in the Underlying Actions," and where the insurer

does not "offer[] any argument on this point in its motion," "the Court cannot conclude that there

is a sufficiently real and substantial controversy over [the] duty to indemnify . . . such that there is

a justiciable case or controversy."  *Ohio Sec. Ins. Co.*, 2024 WL 1287583, at *8.  That is the case

here, and the Court therefore lacks jurisdiction to enter Progressive's requested declaratory

judgment on its indemnification obligations.

### 3. The Court's discretion to decline to exercise jurisdiction over a declaratory judgment action

To say that Progressive has raised a justiciable claim about its duty to defend is not,

however, to say that the Court must hear that claim.  The DJA provides that, "[i]n a case of actual

controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and

other legal relations of any interested party[.]"  28 U.S.C. § 2201(a) (emphasis added).  In using

"may" rather than "must," Congress gave "a broad grant of discretion to district courts to refuse to

exercise jurisdiction over a declaratory judgment action that they would otherwise be empowered

to hear."  *Admiral Ins. Co.*, 57 F.4th at 96 (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d

357, 359 (2d Cir. 2003)).

The Second Circuit has identified six factors that "should inform a district court's exercise

of such discretion[.]"  *Id.* at 99.  First, the court should consider "'whether the declaratory judgment

sought will serve a useful purpose in clarifying or settling the legal issues involved[.]'"  *Id.* (quoting

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (brackets omitted).  Second, it should analyze "'whether such a judgment would finalize the controversy and offer relief from uncertainty[.]'"  *Id.* at 100 (quoting *Niagara Mohawk*, 673 F.3d at 105) (brackets omitted).  Third, it should consider "'whether the proposed remedy is being used merely for procedural fencing or a race to res judicata[.]'"  *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  Fourth, the court should consider "'whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court[.]'"  *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  Fifth, the court should ask itself "'whether there is a better or more effective remedy[.]'"  *Id.* (quoting *Niagara Mohawk*, 673 F.3d at 105).  And sixth, the court should consider "whether concerns for 'judicial efficiency' and 'judicial economy' favor declining to exercise jurisdiction."  *Id.* (quoting *Reifer v. Westport Ins. Co.*, 751 F.3d 129, 141, 149 (3d Cir. 2014)).  "[N]o one factor is sufficient, by itself, to mandate that a district court exercise – or decline to exercise – its jurisdiction to issue a declaratory judgment."  *Id.*  Moreover, the six factors are non-exclusive, and district courts "retain[] wide latitude to address other factors as relevant to the ultimate question of whether 'the normal principle that federal courts should adjudicate claims [over which they have] jurisdiction' should 'yield[] to considerations of practicality and wise judicial administration' in a particular case . . . ."  *Id.* (second and third alterations in original) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)).

Judge Nagala recently applied these six factors to an insurer's duty to defend in *Ohio Security*.  In that case, the executors of two estates sued a construction contractor for their decedents' fatal injuries, but the contractor's insurance policy had been canceled for non-payment of premium weeks before those injuries occurred.  2024 WL 1287583, at *1.  The contractor did not ask for a defense, but its insurer nevertheless filed a declaratory judgment action, seeking a

declaration of no coverage.  *Id.* at *3, 7.  In applying the *Admiral Insurance* factors, Judge Nagala held that the first and sixth did not favor the exercise of jurisdiction.  Because the contractor had "not requested that Ohio defend it," a declaratory judgment would "not serve a useful purpose in settling the legal issues involved or in offering certainty to the parties, and would not serve the interests of judicial economy and efficiency."  *Id.* at *7.  She acknowledged that the second factor – "relief from uncertainty" – favored the exercise of jurisdiction, but "not . . . strongly" because "there appears to be no *active* controversy between any party over Ohio's duty to defend."  *Id.*  The third and fourth factors supported discretionary jurisdiction, but they did not outweigh the first and sixth.  *Id.*  "In essence, while suits have been filed against [the contractor], the question of whether Ohio must defend . . . verges on [the] merely theoretical under the unique factual circumstances presented here, and Ohio appears to have filed this action preemptively, rather than reactively."  *Id.*  Although she had found that the Court *could* exercise jurisdiction over the duty-to-defend claim, she declined to exercise that jurisdiction on the record before her.  *Id.*

This case raises the same concerns about the first and sixth factors.  Like the insurer's complaint in *Ohio Security*, Progressive's complaint does not say that its policyholders even asked to be defended.  (*See generally* Compl., ECF No. 1.)  The Court called this to Progressive's attention (Order, ECF No. 31), pointing out that insurers sometimes assume the defense of a claim without a specific request from the insured.[1]  Progressive's counsel initially responded that he "believe[d] it was through Mrs. Vargas . . . that their defense was requested[.]"  (Tr. of Hrg. on Mot. for Default

---

[1]    Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 3:23 – 4:8 ("I know it sometimes happens that when an accident victim walks into a plaintiff's attorney's office, the plaintiff's attorney looks at the police report and . . . see[s] that Progressive is the insurer and [he] starts talking with Progressive directly.  And then when the statute of limitations approaches, he files the suit and he hands the suit to Progressive.  And sometimes the machinery defending the policyholder gets in motion without the policyholder even asking for a defense.  Is that what happened here or do you have an express request from Mrs. Vargas and Mr. Vargas and the LLP?").

J., ECF No. 40, at 4:9-10.)  But when pressed, he conceded that he did not know, and he asked for leave "to supplement the record with those requisite pieces of evidence."  (*Id.* at 4:25 – 5:11.)  The Court allowed him an opportunity to do so (*id.* at 23:13-15), but in that supplemental filing, Progressive said only that it had "contacted" Sandra Vargas about Mr. Abrams' suit.  (ECF No. 35, at 2.)  It did not say that Mrs. Vargas requested a defense, and it said nothing about Mr. Vargas or Auto Broker.  For all the Court knows, the Vargases might agree that they are not entitled to a defense, and indeed Mr. Vargas filed a *pro se* appearance and answer in the Abrams matter before Progressive stepped in and engaged counsel to defend him.  (Dkt. Sheet and Dkt. No. 106.00, *Abrams v. Vargas*, No. NNH-CV23-6131035-S, *available at* www.civilinquiry.jud.ct.gov).  In short, the record does not support the claim that a declaratory judgment would serve the "useful purpose" of resolving a live dispute between parties who actively disagree, nor that it would be efficient or economical to do so.

The second factor favors the exercise of jurisdiction over the duty-to-defend claim, but only weakly.  Here, as in *Ohio Security*, "entering a declaratory judgment as to [the insurer's] duty to defend will offer relief from uncertainty."  2024 WL 1287583, at *7.  And Progressive made it more likely that a declaration would "finalize the controversy" when it notified Messrs. Abrams and Mackiewicz of this action.[2]  (Exs. A & B to Second Suppl. Submission in Supp. of Mot. for

---

[2]     Progressive could have, but did not, name Messrs. Abrams and Mackiewicz as defendants in this case.  At oral argument, the Court pointed out that they were unlikely to feel bound by any declaration if they had not at least been notified of the pendency of this action.  (Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 6:2-7); *see Conn. Ins. Guar. Ass'n v. Raymark Corp.*, 215 Conn. 224, 228 (1990) ("It is generally held that an injured person having a claim against an insured tortfeasor has a legal interest in a coverage dispute with the insurer and must be either notified or joined as a party in a declaratory judgment action to decide the coverage question.")  Progressive responded to this exchange by providing Abrams' and Mackiewicz's attorneys with written notice.  (Exs. A & B to Second Suppl. Submission in Supp. of Mot. for Default J, ECF Nos. 39-1, 39-2.)

Default J., ECF Nos. 39-1, 39-2.)  But when the record does not demonstrate the existence of an "*active* controversy between any party over [the insurer's] duty to defend, this factor does not weigh strongly."  *Ohio Sec. Ins. Co.*, .."  2024 WL 1287583, at *7.

The third factor – whether the declaratory judgment device is being used for "procedural fencing" – does not clearly support the exercise of jurisdiction on the current record.  On the one hand, Progressive should not be accused of sharp practice when it has merely done what some courts have exhorted similarly situated insurers to do.  *E.g., Nash St., LLC v. Main St. Am. Assur. Co.*, 337 Conn 1, 22 (2020) ("Although our case law does not require it, the prudent, if not ordinary, course would have been for the defendant to defend its insured under a reservation of rights and separately pursue a declaratory judgment action to resolve the legal uncertainty at issue."); *cf. Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh PA*, 692 F.3d 162, 170 (2d Cir. 2012) (citing cases from Colorado and Wisconsin that approved of the technique of defending under a reservation of rights while pursuing a declaratory judgment of no coverage).  But other courts have observed "procedural fencing" when the insurer files a declaratory judgment action before it even notifies the policyholder of its coverage decision, because doing so can deprive the policyholder of its chance to sue for contract breach first.  *E.g., Allied World Surplus Lines Ins. Co. v. Elamex USA Corp.*, No. 23-cv-9992 (LJL), 2024 WL 2212948, at *5 (S.D.N.Y. May 16, 2024); *Travelers Cas. & Sur. Co. of Am. v. Silo City Phase I LLC*, No. 22-cv-416 (JLS) (JJM), 2023 WL 5098228, at *2 (W.D.N.Y. Aug. 2, 2023), *report and recommendation adopted*, 2024 WL 1443972 (W.D.N.Y. Apr. 2, 2024). Here, Progressive's complaint does not disclose when it first told the Vargases about its position on the duty to defend.  (*See generally* Compl., ECF No. 1.)

The fourth and fifth factors raise no particular concerns in the context of Progressive's duty-to-defend claim.  But here, as in *Ohio Security*, the factors disfavoring the exercise of

jurisdiction outweigh the factors favoring it.  Like the contractor in that case, the Vargases apparently have not even requested a defense.  So far as the record discloses, they may even agree that they are not entitled to one.  It would serve no "useful purpose" to issue a declaratory judgment on an issue as to which the parties may not even disagree, and in any event it would not be economical or efficient to do so.  I therefore recommend that Judge Nagala decline to exercise jurisdiction over Progressive's duty-to-defend claim.

### B.       Progressive's Motion for a Default Judgment Declaring No Duty to Defend

In summary, the Court does not have jurisdiction over Progressive's duty-to-indemnify claim, and it should not exercise jurisdiction over the duty-to-defend claim.  Ordinarily, the analysis would stop there.  *See, e.g., Charter Oak Fire Ins. Co. v. Bolding*, No. 08-cv-2632 (KAM), 2009 WL 3246116, at *5 (E.D.N.Y. Oct. 1, 2009) ("Because the court lacks subject matter jurisdiction over Charter Oak's claim seeking declaratory relief . . . it does not reach the merits of Charter Oak's claim.").  I will nevertheless provide the following discussion of the merits of Progressive's motion as it relates to the duty-to-defend claim, for Judge Nagala's consideration in the event that she disagrees with my analysis of the discretionary jurisdiction issue.  I will begin by setting forth the legal principles applicable to default judgment motions, followed by the relevant choice-of-law principles. I will then discuss the Connecticut law concerning the duty to defend, and analyze Progressive's claim that it has no such duty here.

### 1.       *Default judgments*

When a defendant defaults, it "thereby admits all 'well-pleaded' factual allegations contained in the complaint."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004))..  And "[w]hen a defendant defaults in appearing or defending, a court may grant

declaratory relief among other remedies." *Conn. Gen. Life Ins. Co. v. Ogbebor*, No. 3:21-cv-954 (JAM), 2022 WL 4077988, at *4 (D. Conn. Sept. 6, 2022) (citing *Am. Eur. Ins. Co. v. Tirado Iron Works & Fence, Inc.*, No. 19-cv-6851 (EK) (RLM), 2021 WL 7830143, at *4 (E.D.N.Y. Oct. 20, 2021)).

These principles do not mean, however, that courts should skip over all questions of liability in deciding motions for default judgments. As Judge Haight has observed, "[b]ecause default is only an admission of well-pleaded allegations, it 'is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover.'" *Trs. of the I.B.E.W. v. Norland Elec., Inc.*, No. 3:11-cv-709 (CSH), 2015 U.S. Dist. LEXIS 193752, at *5 (D. Conn. Feb. 19, 2015) (quoting *Evanauskas v. Strumpf*, No. 3:00-cv-1106 (JCH), 2001 WL 777477, at *1 (D. Conn. June 27, 2001)). "Therefore, before judgment can be entered, the court must determine whether plaintiff's factual allegations are sufficient to state a claim for relief on each of the causes of action for which the plaintiff seeks judgment by default." *Evanauskas*, 2001 WL 777477, at *1 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)). In other words, "[w]hile a default constitutes an admission of all the facts 'well pleaded' in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action." *In re Indus. Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure, Civil § 2688, at 63 (3d ed. 1988)); *accord Trs. of the I.B.E.W.*, 2015 U.S. Dist. LEXIS 193752, at *5-6 (collecting cases).

### 2.     *Choice of law*

When a plaintiff sues in federal court and invokes diversity jurisdiction, the court "must apply the choice-of-law rules of the state in which that court sits[.]" *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). In insurance cases, Connecticut's choice-of-law

rules provide that "the law of the state with the most significant relationship to the transaction and parties ought to be applied absent a choice of law provision in the insurance contract." *Farm Family Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 87 (D. Conn. 2017) (internal quotation marks omitted) (citing *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 781 n.4, 782 (2000)). In this case, there is no choice-of-law provision in the Policy (*see generally* Policy, ECF No. 30), and Connecticut is the state with "the most significant relationship." The two named insureds live here, and the contract was brokered by a Connecticut agent. (*See id.* at 4-5) (declarations page listing insureds' address in Meriden, and indicating that the Policy was brokered by the Lous Sacoto Agency of Bridgeport); *see also Middlesex Mut. Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 446 (D. Conn. 2010) (applying Connecticut law because named insureds lived in Connecticut and policy was "entered into and executed" through a Connecticut agent). The Court will therefore apply Connecticut law.

### 3.    *Progressive's duty to defend*

"[T]he duty to defend is considerably broader than the duty to indemnify." *DaCruz*, 268 Conn. at 687. Whereas the duty to indemnify "depends upon the facts established at trial and the theory under which judgment is actually rendered in the case[,]" *Schilberg Integrated Metals Corp. v. Cont'l Cas. Co.*, 263 Conn. 245, 257 (2003), the insurer's duty to defend is "determined by reference to the allegations contained in the underlying complaint." *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 711 (2003) (brackets omitted). "The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage." *Id.* at 711-12. Thus, "if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend." *Springdale Donuts, Inc. v. Aetna Cas.*

& *Sur. Co. of Ill.*, 247 Conn. 801, 807 (1999) (quoting *Smedley Co. v. Emp'rs Mut. Liab. Ins. Co.*, 143 Conn. 510, 517 (1956)).  "Indeed, 'if an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured.'"  *Cmty. Action for Greater Middlesex Cnty. v. Am. Alliance Ins. Co.*, 254 Conn. 387, 399 (2000) (quoting *Moore v. Cont'l Cas. Co.*, 252 Conn. 405, 409 (2000)) (brackets omitted).

Leaving aside the coverage status of the Durango for the moment, the Abrams and Mackiewicz complaints plainly contain allegations that would trigger Progressive's duty to defend. The Policy's liability coverage applies to claims for "damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident" (Policy, ECF No. 30, at 21), and both plaintiffs clearly allege bodily injuries arising out of a car accident that occurred on December 8, 2022.  (Abrams Complaint, Count One, ¶¶ 4-6; Mackiewicz Complaint, Count One, ¶¶ 3-5.)  Sandra Vargas qualifies as an "insured person" because she is the named insured.  (Policy, ECF No. 30, at ECF pages 20-21 (defining "insured person" to include "you," which in turn is defined to include "a person shown as a named insured on the **declarations page**") and ECF page 7 (declarations page listing Sandra Vargas as a named insured).)  Jose Vargas no doubt qualifies as an "insured person," although his route to that position would depend on the status of his divorce on the date of the accident; if the Vargases were still married on the date of the accident, he would qualify as Sandra Vargas's "relative," but if the divorce had become final, he would qualify as a "rated resident" of her home. (*Id*. at ECF pages 20-21 (defining "insured person" to include "relative[s]" and "rated resident[s];" defining "relative" as "a person residing in the same household as **you**, and related to **you** by . . . marriage;" and defining "rated resident" as "a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both . . . listed in the 'Drivers and household residents' section on the

**declarations** page; and . . . not designated as either an 'Excluded' or a 'List Only' driver") and ECF page 7 (declarations page listing Jose S. Vargas among the "Drivers and resident relatives" covered by the Policy).)  Finally, Auto Broker would qualify as an "insured" because Messrs. Abrams and Mackiewicz allege that it is vicariously liable for Mrs. Vargas's negligence.  (Abrams Complaint, Count Four, ¶¶ 9-10; Mackiewicz Complaint, Count Five, ¶¶ 10-13; *see also* Policy, ECF No. 30, at ECF page 21 (defining "insured person" to include "any person or organization with respect only to vicarious liability for the acts or omissions of" a named insured, relative, or "rated resident").)  Progressive does not dispute that the Vargases and Auto Broker would be entitled to a defense, but for the issue of the Durango's status under the Policy.

The question, then, is what to make of that issue.  To recap, the Durango was a "covered auto" when the Policy's coverage began on October 24, 2022.  (Compl., ECF No. 1, ¶ 14; Policy, ECF No. 30, at ECF page 4.)  Mrs. Vargas called on November 29, 2022 to ask that the Durango be deleted from the Policy, and Progressive obliged.  (Compl., ECF No. 1, ¶ 15; Policy, ECF No. 30, at ECF pages 7-8.)  Mrs. Vargas then had an accident in that car on December 8, 2022. (Compl., ECF No. 1, ¶¶ 6, 9, 12.)  Fifteen days later she called to ask that the car be reinstated as a covered vehicle on the Policy, retroactive to November 29, and Progressive again complied. (Compl., ECF No. 1, ¶ 17 ("On December 23, 2022, Sandra Vargas called Progressive to ask that the 2019 Dodge Durango be reinstated to the Policy as a covered vehicle."); Memo. of L. in Supp. of Pl.'s Req. to Enter Default J., ECF No. 25, at 7 (stating that both the request and the subsequent reinstatement were "retroactive[]").)  She did not tell Progressive that she had had the accident in the meantime (Compl., ECF No. 1, ¶ 18), and Progressive only learned about it months later when a third party alerted it to the Abrams lawsuit.  (Suppl. Submission in Supp. of Mot. for Default J., ECF No. 35, at 2.)  Progressive asserts that Mrs. Vargas's conduct constitutes "misrepresent[ation]

through omission . . . [of a] known loss," and that this misrepresentation negates any defense obligation that it might have otherwise had.  (Compl., ECF No. 1, ¶¶ 19, 24.a.)

In many cases, this issue might be resolved in the insurer's favor by applying the "known loss doctrine."  That doctrine "is a common law concept that derives from the fundamental concept of fortuity in insurance law."  *Travelers Prop. Cas. v. H.A.R.T., Inc.*, No. CV-98-0485730-S, 2001 Conn. Super. LEXIS 1388, at *17 (May 18, 2001).  "Essentially, the doctrine provides that one may not obtain insurance for a loss that either has already taken place or is in progress."  *Id.* (citing 12 John A. Appleman & Jean Appleman, Insurance Law & Practice § 7001); *see also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1214 (2d Cir. 1995) (characterizing the doctrine as "the insurance law principle that an insured may not obtain insurance to cover a loss that is known before the policy takes effect"); *Yale Univ. v. CIGNA Ins. Co.*, 224 F. Supp. 2d 402, 416 (D. Conn. 2002) (same).  In *H.A.R.T.*, for example, Travelers cancelled an automobile policy for non-payment of premium, and the insured requested retroactive reinstatement without telling the company that a fatal accident had occurred in the meantime.  2001 Conn. Super. LEXIS 1388, at *1-7.  Travelers moved for a declaratory judgment of no coverage, and Judge Aurigemma granted the motion.  *Id.* at *22.  Because "'the purpose of insurance is to protect against unknown risks," the fatal accident was not covered "because it was a known loss." *Id.* at *17, 19-20 (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982)).

In this case, however, the issue would be controlled by Progressive's policy language rather than by the operation of a common law doctrine.  As noted above, Progressive's policy contains an express provision explaining how the company will treat policy changes that the insured obtains through concealment or misrepresentation.  (Policy, ECF No. 30, at ECF pages 43-44.)  When contracting parties include a provision overriding a default common-law doctrine, it is the

provision and not the doctrine that controls. *Middlesex Mt. Assur. Co. v. Vaszil*, 279 Conn. 28, 34 (2006) (observing that default rules can be overcome by contractual provisions because parties "are always free to allocate their risks and coverages by specific agreements"); *Dilullo v. Joseph*, 259 Conn. 847, 851 (2002) (same). Progressive apparently does not dispute this point, because in its brief it appeals to its policy language and not to the common law "known loss" doctrine. (Memo. of L. in Supp. of Pl.'s Req. to Enter Default J., ECF No. 25, at 6-8.)

The controlling provision is the "Fraud or Misrepresentation" article. (*Id.*; *see also* Policy, ECF No. 30, at ECF pages 43-44.) As relevant here, the article begins with a statement that "[a]ny changes we make at your request to this policy after inception will be made in reliance upon information you provide." (Policy, ECF No. 30, at ECF page 43.) It then provides that "[i]f you . . . .conceal or misrepresent any material fact or circumstance . . . in connection with a requested change we may void the policy or reform it as it existed immediately prior to the requested change." (*Id.*) Although Progressive did not use the word "reform" in its complaint (*see generally* Compl., ECF No. 1), it now characterizes this case as an effort to invoke this right of reformation. (Memo. of L. in Supp. of Pl.'s Req. to Enter Default J., ECF No. 25, at 8 (arguing that, "because of this misrepresentation, the Progressive Policy is reformed" to delete all coverage for the Durango); Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 15:3-6 ("All we're asking is for the Court to declare [Mrs. Vargas's] attempts to reform the policy after the fact as a nullity and reform it back to the way it was prior.").) And if the Fraud and Misrepresentation article had stopped there, Progressive might have had a compelling argument.

But the article does not stop there. It goes on to describe how Progressive will respond if it discovers that the insured obtained a policy change through concealment or misrepresentation. Critically, the Policy does *not* say that the company will refrain from defending, nor that it will

deny all indemnity coverage.  (Policy, ECF No. 30, at ECF page 44.)  Rather, it says that the company *will* provide liability coverage up to the minimum limits required by state law.  (*Id.*)  And Progressive conceded at oral argument that if the Policy requires indemnity coverage up to the state minimum limits, it requires defense coverage as well.  (Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 17:7-12.)

The Policy gives Progressive three options if the insured secures a policy change through concealment.  The first is to "void the policy" entirely, and the second is to "reform it as it existed immediately prior to the requested change."  (Policy, ECF No. 30, at ECF page 43.)  In either case, the contract expressly states that Progressive's election "shall not affect coverage under Part I – Liability to Others up to the minimum limits required by the financial responsibility law of the state shown on your application as your residence if the accident occurs before we notify the named insured that the policy is void or has been reformed."  (*Id.* at ECF page 44.)  Progressive's third option is to accept the policy change despite the concealment.  (*Id.*)  In that event it "may still deny coverage for" the accident, but again, "[t]his shall not affect coverage under Part I – Liability to Others up to the minimum limits required by the financial responsibility law of the state shown on your application as your residence[.]"[3]  (*Id.*)  In short, Progressive's own contract gives it three options for dealing with a policy change obtained through concealment.  In each of the three, it

---

[3]     At oral argument, Progressive's counsel explained the reasons for this provision.  In an evident reference to cases like *Munroe v. Great American Insurance Co.*, 234 Conn. 182 (1995), counsel observed that "[t]he Connecticut Supreme Court has made clear that misrepresentations at the time of the application cannot – for public policy reasons – cannot affect the indemnity obligations of an insurance company to third parties if the misrepresentation isn't identified until after an accident."  (Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 13:9-13.)  The Court asked if the Fraud and Misrepresentation article could be regarded as "Progressive saying, hey, look, in a lot of states I know that I can't reform the policy back to no coverage if a loss [has] intervened. So the best I might be able to do is to take the limit down to the statutory minimum.  Isn't that what this paragraph is accomplishing[?]"  (*Id.* at 13:21-25.)  Counsel agreed "that that's what the purpose of that clause is."  (*Id.* at 14:2-4.)

must provide the state minimum liability coverage – and, by extension, defense coverage.  (Tr. of Hrg. on Mot. for Default J., ECF No. 40, at 17:7-12.)

Progressive interprets this provision as not requiring even minimum coverage in this case. In Progressive's view, the Fraud and Misrepresentation article applies differently depending on the type of concealment or misrepresentation.  (*Id.* at 12:16-19) ("Because this provision covers all sorts of different types of fraud and misrepresentation, it operates in different ways depending on the type of fraud or misrepresentation.").  Progressive allows that the state mandatory minimum coverage limits would apply when, for example, an insured fails to disclose another driver in her home – because in that scenario, "state statutes and regulations on financial responsibility laws come into play."  (*Id.* at 12:20 – 13:8.)  But it argues that, when the misrepresentation or concealment concerns adding a vehicle to the policy, the Fraud and Misrepresentation article does not mandate minimum limits because "there's no state financial minimum requirement that an insurer cover every single vehicle owned by an individual."  (*Id.* at 14:5-7.)

The Court does not find this interpretation persuasive, for several reasons.  To begin with, the Policy simply does not distinguish between different types of misrepresentations.  Instead, it says that *any* instance of material concealment or misrepresentation will endow Progressive with the same three options – and under each of those options, Progressive must provide liability coverage "up to the minimum limits required by the financial responsibility law of the state[.]" (Policy, ECF No. 30, at ECF page 44.)  Furthermore, Progressive's interpretation would turn the minimum limits language into meaningless surplusage in many commonly encountered scenarios, and such interpretations are disfavored under Connecticut law.  *See, e.g., Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 56-57 (2014) ("To the extent that an interpretation makes another term or provision meaningless, that interpretation should be rejected in favor of an

interpretation that preserves meaning."); *Ceci v. Nat'l Indem. Co.*, 225 Conn. 165, 175 (1993) ("Although some jurisdictions . . are not troubled by an interpretation of an insurance policy that creates a nullity of some provisions, [the Connecticut Supreme Court has] consistently stated that if it is reasonably possible to do so, every provision of an insurance policy must be given operative effect[.]") (brackets and quotation marks omitted).  And even if Progressive's interpretation were a permissible one, it would not be the only permissible interpretation.  Put differently, even if the Fraud and Misrepresentation article could be read Progressive's way, it could also be read as requiring minimum limits and defense coverage here; and when an insurance policy is reasonably susceptible to more than one interpretation, the one that favors coverage prevails.  *Springdale Donuts, Inc.*, 247 Conn. at 805-06.

## IV.   CONCLUSION

For the foregoing reasons, I recommend that Judge Nagala **DENY** the motion of the Plaintiff, Progressive Casualty Insurance Company, for entry of a default judgment against the Defendants Sandra Vargas, Jose S. Vargas, and Sandra V Auto Broker CT LLC.

This is a recommended ruling by a Magistrate Judge.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with this order.  Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days "operates as a waiver of any further judicial review of the [Magistrate Judge's] decision[,]" including by the Court of Appeals.  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (holding that a failure to file a timely objection to a Magistrate Judge's recommended ruling precluded review by the Second Circuit); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6.

Entered at Hartford, Connecticut this 11th day of September, 2024.


                                        */s/ Thomas O. Farrish*
                                        ─────────────────────────────
                                        Hon. Thomas O. Farrish
                                        United States Magistrate Judge